**UNITED STATES DISTRICT COURT
DISTRICT OF MAINE**

| | |
|---|---|
| APRIL BENNER,           ) | |
|           ) | |
|       Plaintiff,     ) | |
|           ) | |
| v.           ) | Docket No. 2:16-cv-00467-NT |
|           ) | |
| WELLS FARGO BANK, N.A., AS  ) | |
| TRUSTEE FOR THE CERTIFICATE  ) | |
| HOLDERS OF MASTR ASSET-  ) | |
| BACKED SECURITIES TRUST 2007-  ) | |
| NCW, MORTGAGE PASS-THROUGH  ) | |
| CERTIFICATES, SERIES 2007-NCW  ) | |
| *et al.*,          ) | |
|           ) | |
|       Defendants.    ) | |

**ORDER ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY
JUDGMENT AND PLAINTIFF'S MOTION TO SUPPLEMENT THE FIRST
AMENDED COMPLAINT**

In this action, Plaintiff April Benner ("**Ms. Benner**") asserts claims against

Defendants Specialized Loan Servicing, LLC ("**SLS**") and Wells Fargo Bank, N.A., in

its capacity as Trustee for the Certificate Holders of the MASTR Asset-Backed

Securities Trust 2007-NCW, Mortgage Pass-Through Certificates, Series 2007-NCW

("**Wells Fargo**"), arising out of the Defendants' purported mishandling of her

mortgage loan modification applications.[1] Ms. Benner alleges that the Defendants'

conduct violated the Real Estate Settlement Procedures Act ("**RESPA**"), the Maine

Unfair Trade Practices Act ("**UTPA**"), and the Maine Consumer Credit Code

---

[1]     Ms. Benner also asserted claims against Select Portfolio Loan Servicing, Inc., but she has since settled those claims and now proceeds solely against SLS and Wells Fargo. Def.'s Mot. 1 n.1 (ECF No. 66).

("**MCCC**"). Before me are the parties' cross-motions for summary judgment (ECF Nos. 66, 78) and Ms. Benner's motion to supplement her First Amended Complaint (ECF No. 70) ("**Pl.'s MTS**"). For the reasons set out below I **GRANT IN PART** and **DENY IN PART** the Defendants' motion for summary judgment, and I **DENY** Ms. Benner's motion for summary judgment and Ms. Benner's motion to supplement.

## FACTUAL BACKGROUND

On February 22, 2007, Ms. Benner and her now ex-husband Robie Benner ("**Mr. Benner**") executed a promissory note with a principal balance of $204,000 payable to New Century Mortgage Corporation. SMF ¶ 1. The note was secured by a mortgage on real property located at 683 Main Street, Bowdoin, Maine (the "**Property**"). SMF ¶ 2. Ms. Benner and Mr. Benner were legally divorced via a Judgment for Divorce dated September 24, 2012. SMF ¶ 12. Mr. Benner transferred his interest in the Property to Ms. Benner at the time of their divorce. Ex. 44 (ECF No. 62-3).

During all times relevant here, Wells Fargo has served as the mortgagee of record on behalf of the promissory note-holders, the Certificate Holders of the MASTR Asset-Backed Securities Trust 2007-NCW, Mortgage Pass-Through Certificates, Series 2007-NCW. SMF ¶¶ 3, 4, 211. Wells Fargo acts as mortgagee in its capacity as trustee. SMF ¶¶ 3-4. Since June 1, 2015, SLS has serviced Ms. Benner's mortgage loan as the sole servicer on behalf of Wells Fargo. SMF ¶¶ 5, 6, 7.

# I.  Servicing and Loss Mitigation History

Ms. Benner and Mr. Benner defaulted on their mortgage loan in April 2011 and remained in default thereafter. SMF ¶ 11; *see* SMF ¶ 13. On May 13, 2014, Wells Fargo filed a foreclosure action against Ms. Benner and her ex-husband in state court. SMF ¶ 22. The parties entered into Maine's Foreclosure Diversion Program, and the foreclosure action was put on hold. SMF ¶ 23.

In August 2014, Ms. Benner submitted a loan modification application to Select Portfolio Servicing, Inc. ("**SPS**"), which had been the servicer for Ms. Benner's loan since December 1, 2012. SMF ¶¶ 8, 25. Between January 2015 and May 2015, SPS solicited and Ms. Benner provided additional information and documents in support of her application for the loan modification. SMF ¶¶ 30, 32. During that time, SPS twice indicated to Ms. Benner that it had received a complete application and that it would review her loan for a potential modification. SMF ¶¶ 26, 31. On both occasions, SPS then determined that Ms. Benner was eligible only for a proprietary Bank of America modification. SMF ¶¶ 27, 28, 31.[2] Because that modification was less favorable than modifications available under the Home Affordable Modification Program ("**HAMP**"), SPS did not offer Ms. Benner the proprietary modification and instead continued to review her application to see if she could qualify for a better modification. SMF ¶¶ 29, 31.

---

[2]  SLS avers that SPS serviced Ms. Benner's loan as a sub-servicer for Bank of America, which in turn acted as master servicer for the MASTR Asset-Backed Securities Trust 2007-NCW, Mortgage Pass-Through Certificates, Series 2007-NCW. SMF ¶ 9. Ms. Benner contests these facts, but not the fact that SPS offered her a proprietary Bank of America modification.

Throughout this time, Wells Fargo, SPS, Ms. Benner, and Mr. Benner remained engaged in foreclosure mediation. SMF ¶ 34. Ms. Benner was represented in the mediation free of charge by a loan modification advocate named Jason Thomas ("**Mr. Thomas**"). SMF ¶ 35. In May 2015, she also retained an attorney, Andrea Bopp Stark ("**Ms. Stark**"). SMF ¶ 36. On May 29, 2015, SPS deemed Ms. Benner's application complete for a third time. SMF ¶ 33.

## II.    Servicing Transfer to SLS

Effective June 1, 2015, SPS transferred servicing of Ms. Benner's loan to SLS as part of a larger servicing transfer of 2,450 loans. SMF ¶¶ 37, 39. It is SLS's practice to send transferor servicers a set of Servicing Transfer Instructions ahead of any servicing transfer. *See* SMF ¶ 38; Ex. 28 at 18 (ECF No. 60-7). The instructions ask the transferor to provide SLS with all documents associated with the transferred loans and to inform SLS if any of the transferred loans had a pending loan modification application. SMF ¶ 38; Ex. C at 19-21 (ECF No. 64-3). The instructions also ask the transferor to certify that it has sent SLS a complete servicing file for all transferred loans, including borrower-submitted loss mitigation documents. *See* SOF ¶ 38; Ex. 9 at 2 (ECF No. 57-8). SPS signed the required certification on May 29, 2015. SMF ¶ 39.[3]

On or "slightly before" June 1, 2015, SPS sent a spreadsheet to SLS that contained information for all 2,450 of the service-transferred loans. SMF ¶ 45; Ward

---

[3]      Ms. Benner contends that while SPS signed the certification form, which is included as an appendix to the Servicing Transfer Instructions, the Defendants have not shown that the full instructions were sent to SPS.

Depo. Tr. at 36:7-20 (ECF No. 61). The spreadsheet included the following series of entries related to Ms. Benner's loan:

| LOAN_NO | WorkoutStatusName | WorkoutTypeName | ProductName | Eligible | IsOptOut | IsDenied | ProductStatus | ReasonDisplayName |
|---|---|---|---|---|---|---|---|---|
| | Processing | Complete Package Review | HAMP Unemployment | 1 | 0 | 1 | Denied | Not Currently Unemployed |
| | Processing | Complete Package Review | SPS Unemployment | 1 | 0 | 1 | Denied | Not Currently Unemployed |
| | Processing | Complete Package Review | HAMP Tier 1 Trial Mod | 1 | 1 | 1 | Denied | HAMP-Escrow payment exceeds 31% payment |
| | Processing | Complete Package Review | HAMP Tier 2 Trial Mod | 1 | 0 | 1 | Denied | HAMP-DTI Outside of Acceptable range |
| | Processing | Complete Package Review | BAC Trial Mod | 1 | 0 | 0 | Processing | NULL |
| | Processing | Complete Package Review | Repayment Plan | 1 | 0 | 1 | Denied | Financials Do Not Support |

Ex. 8 (ECF No. 57-7). The spreadsheet indicates that Ms. Benner was reviewed for but denied multiple HAMP and other modifications. SMF ¶ 46. The spreadsheet also shows that SPS was "Processing" a workout for Ms. Benner for a product called a "BAC Trial Mod." SMF ¶ 46.

As part of a series of "document dumps" (mass transfers of files) on June 3, 2015, June 28, 2015, and July 8, 2015, SLS received from SPS certain documents that Ms. Benner had submitted to SPS in support of her loan modification application. *See* SMF ¶¶ 43, 48. However, SLS did not receive what it considered a complete loan modification application from Ms. Benner. *See* SMF ¶ 41; Ex. 28 at 7 (ECF No. 60-7). Specifically, SLS did not receive a Request for Mortgage Assistance ("**RMA**") from each person who could contribute to repaying Ms. Benner's loan. SMF ¶ 44. SLS did not contact SPS to request any additional documents for Ms. Benner. SMF ¶ 165.

## III.   June 8, 2015 Mediation Session

Before the servicing transfer, the parties to Ms. Benner's foreclosure action had scheduled a mediation session for June 8, 2015. SMF ¶ 54. On June 2, 2015, Ms. Benner's loss mitigation counselor, Mr. Thomas, informed her attorney, Ms. Stark, that SPS had transferred servicing to SLS and that he did not expect SLS to attend the June 8th session or to have any information on the loan until mid-June 2015. SMF ¶ 55. Mr. Thomas suggested that Ms. Benner should nevertheless attend the mediation in order to make a case for mediation non-compliance against SPS and Wells Fargo. SMF ¶ 56.

Ms. Benner did attend the mediation session, missing half a day of work and travelling to West Bath, Maine in order to do so. SMF ¶ 160. SLS did not appear at the mediation session. SMF ¶ 161. The mediator contacted SLS by phone during the mediation. SMF ¶ 161. Finding that neither SPS nor SLS was prepared to meaningfully participate in the mediation session, the mediator entered a report of non-compliance against Wells Fargo. SMF ¶ 162.

## IV.   Ms. Benner's First Purported Qualified Written Request

On June 18, 2015, Ms. Benner, through Ms. Stark, sent a letter to SLS. SMF ¶ 142. The letter purported to notify SLS of errors SPS had committed in handling Ms. Benner's loss mitigation applications. SMF ¶ 143. The letter also requested "an immediate determination and explanation for any denial of all loss mitigation options including modifications under the DOJ, HAMP, and any in-house programs on Ms. Benner's loan," and requested certain documents related to Ms. Benner's loan history. SMF ¶ 143; Ex. 24 at 2-4 (ECF No. 60-3).

SLS received the letter on June 23, 2015 and acknowledged receipt on June 26, 2015. SMF ¶¶ 145, 146. By letter dated June 30, 2015 and mailed to Ms. Stark, SLS responded more fully and provided documents including a copy of Ms. Benner's promissory note, a copy of the deed of trust, a welcome letter, payment history and transaction codes, and the previous servicer's payment history. SMF ¶ 147.

## V.    Ms. Benner's Loss Mitigation Applications to SLS

### A.    Application Transferred from SPS

On June 20, 2015, SLS sent a letter to Ms. Benner and Mr. Benner that informed them they were delinquent on their loan and that asked them to contact SLS to discuss possible loss mitigation options. SMF ¶ 63.

On June 29, 2015, SLS sent a letter to Ms. Benner care of Ms. Stark. SMF ¶ 64. The letter stated that on June 28, 2015, the date of SPS's second file transfer to SLS, SLS had received nine documents that could support a loan modification application for Ms. Benner. SMF ¶ 65. The letter also listed several additional documents that SLS believed it needed in order to review Ms. Benner for a modification. SMF ¶ 65. Specifically, the letter asked Ms. Benner to submit an RMA form, Dodd-Frank Certification, and Hardship Verification from all "financial contributors" on the loan by July 29, 2015. SMF ¶ 66. The letter contained descriptions of the requested forms, and directed Ms. Benner or her attorney to contact SLS if they had any questions. SMF ¶ 67. The letter did not define the term "financial contributor." SMF ¶ 171.

On July 15, 2015, SLS sent a letter to Ms. Stark to inform her that SLS still needed the documents requested in its June 29th letter. SMF ¶ 68.

On August 5, 2015, SLS informed Ms. Benner and Mr. Benner that it was unable to review them for modification options because they had not provided all requested documents. SMF ¶ 72.

**B.    August 20, 2015 Application**

On August 6, 2015, SLS sent Ms. Benner a HAMP solicitation letter asking her for a new loss mitigation application. SMF ¶ 181. Mr. Thomas prepared a loss mitigation application for Ms. Benner, and, on August 20, 2015, Ms. Stark submitted the application to SLS. SMF ¶¶ 79, 182.

That afternoon, SLS informed Doonan, Graves & Longoria ("**Doonan Graves**"), Wells Fargo's counsel in the foreclosure suit, that it had reviewed the documents that Ms. Benner's counsel had provided earlier that day. SMF ¶ 82; *see* SMF ¶ 73. SLS noted that it had follow-up legal questions and that it would need additional information and documents from Ms. Benner. SMF ¶ 82. Doonan Graves then emailed Mr. Thomas and Ms. Stark to describe what information SLS still needed and why, which included (i) two months proof of receipt for all rental income along with either bank statements marking each deposit of rent or cancelled checks; (ii) a mortgage statement for a rental property; (iii) signed and dated tax returns or a 4506-T form from Ms. Benner's grandmother Edith Rossignol ("**Ms. Rossignol**"); and (iv) a corrected letter of explanation regarding the discrepancy between Ms. Benner's stated gross wages and her paystubs. Ex. 18 at 8-9 (ECF No. 59-7); *see also* SMF ¶ 83. The email also requested "a copy of the court entered divorce decree . . . [o]r something from the court indicating that no appeal had been taken and therefore the decree provided is final." Ex. 18 at 9.

On August 24, 2015, SLS wrote to Ms. Stark, requesting the following documents by September 23, 2015:

- From Mr. Benner, one of the following: (i) "4506T and Unemployment Benefits – Proof of Receipt," (ii) "4506T and Unemployment Benefits," (iii) "Tax Returns/Tax Transcripts and Unemployment Benefits – Proof of Receipt," or (iv) "Unemployment Benefits and Tax Returns/Tax Transcripts."

- From Ms. Benner, one of the following: (i) "Mortgage Statement" or (ii) "Mortgage Statement and Rental Income – Proof of Receipt."

- From Ms. Rossignol, a "Contributor Credit Authorization" and one of the following: (i) "Mortgage Statement and Tax Returns/Tax Transcripts," or (ii) "Rental Income/Lease Agreement and Mortgage Statement and Rental Income – Proof of Receipt."

*See* Ex. 17 at 31 (ECF No. 59-6); SMF ¶ 84.

On September 10, 2015, SLS sent another letter to Ms. Benner, care of Ms. Stark, which noted that SLS had not received the information requested in its August 24th letter and which gave Ms. Benner until September 25, 2015, to submit those documents. SMF ¶ 88. On the same day, Doonan Graves emailed Mr. Thomas and Ms. Stark to explain that SLS still needed certain documents "to complete the underwriting review," including (i) a "signed/dated complete Contributor Credit Authorization;" (ii) a "Mortgage Statement for non-subject property to show current and escrow account verification;" (iii) a "judge executed Divorce Decree with Property award clause;" and (iv) "2 more consecutive weekly paystubs for the borrower [because] (paystubs received were not consecutive and did not cover a FULL 30 days)." Ex. 19 at 39 (ECF No. 59-8); *see also* SMF ¶ 89. Ms. Stark instructed Ms. Benner to submit these documents to SLS "ASAP." SMF ¶ 90.

On September 23, 2015, Mr. Thomas emailed several documents to Doonan Graves on Ms. Benner's behalf. SMF ¶ 98. These included (i) a letter explaining Ms. Benner's income sources; (ii) a contributor credit authorization form for Ms. Rossignol; (iii) paystubs from Ms. Benner's new job and from her time at L.L. Bean; (iv) two months of bank statements; (v) a 4506-T form for Ms. Rossignol; (vi) four rental receipts; (vii) a mortgage statement for Ms. Benner's rental property; and (viii) her judgment for divorce and quitclaim deed. SMF ¶ 190.

On September 29, 2015, SLS sent a letter to Ms. Stark that requested the same documents listed in SLS's letters of August 24 and September 10, 2015, as well as an RMA for all financial contributors, to be provided by October 14, 2015. SMF ¶ 99.

In early October of 2015, Bendett & McHugh replaced Doonan Graves as Wells Fargo's foreclosure counsel in Ms. Benner's action. SMF ¶ 101. On October 16, 2015, Bendett & McHugh emailed Ms. Benner's counsel to inform her that:

> [T]he following docs are needed to proceed with loss mitigation review:
>
> -Please indicate on the submitted Bank statements the SSI income in August and September, so that we can understand which income corresponds to which source.
> -Please provide a LOE as to (1) why the SSI amounts vary, and (2) please state that income is deposited for Edith into April's account (just so it is fully documented).
> -Please provide proof of residency for Edith since her bank statements show a PO box (ie: third party documentation will be needed such as driver license/utility bill).

Ex. 12 at 2 (ECF No. 59-1); *see* SMF ¶¶ 101-02.

Just three days later, on October 19, 2015, SLS sent another letter to Ms. Stark, which stated that SLS was unable to review Ms. Benner and Mr. Benner for a modification because SLS had not received required documents. SMF ¶ 100. SLS has

testified that it issued the October 19, 2015, denial letter because Ms. Benner had not submitted the requested August and September 2015 bank statements flagging her social security income, evidence that Ms. Rossignol's rental income was deposited into Ms. Benner's bank account, or the requested RMAs from financial contributors. SMF ¶ 192 (citing Ward Depo. Tr. at 118:2-123:10).

On October 20, 2015, SLS sent Ms. Benner a new HAMP solicitation letter. SMF ¶ 198. On October 21, 2015, Mr. Thomas emailed Ms. Stark with "the three documents requested by [Bendett & McHugh]." SMF ¶ 104; Ex. 18 at 75. Ms. Stark suggested several changes to bring those documents in line with Bendett & McHugh's requests. SMF ¶ 105. The parties do not dispute that Ms. Benner submitted additional documents October 23, 2015, but neither party has presented evidence of whether those documents incorporated Ms. Stark's suggestions. SMF ¶¶ 105-06.

On October 26, 2015, SLS sent a letter to Ms. Stark to inform her that SLS was still missing RMAs from all financial contributors to the loan and a contributor credit authorization from Ms. Rossignol. SMF ¶ 106. SLS asked Ms. Benner to provide those documents by November 25, 2015. SMF ¶ 107.

On November 2, 2015, Bendett & McHugh emailed Mr. Thomas and Ms. Stark that SLS needed paystubs from Ms. Benner's former employer, L.L. Bean, for the full month of August 2015. SMF ¶ 109. On November 5, 2015, Mr. Thomas emailed Bendett & McHugh to explain that Ms. Benner did not work for L.L. Bean at the end of August 2015, and therefore had no L.L. Bean paystubs for August 14, 2015 or

August 21, 2015. SMF ¶ 111.[4] Bendett & McHugh responded by email the same day to ask whether Ms. Benner had any additional paystubs from L.L. Bean, as SLS was trying to utilize an exception for non-consecutive paystubs but needed to have a full 30 days of paystubs from some time period in order to do so. SMF ¶ 112. On November 6, 2015, Ms. Stark responded to Bendett & McHugh by email, telling them that SLS already had Ms. Benner's paystubs from June 12 through August 26, 2015 and reattaching those paystubs as reference. SMF ¶ 113. On November 11, 2015, SLS sent an additional letter to Ms. Stark, which stated that SLS was still missing an RMA from all financial contributors, and asked her to submit that document by November 26, 2015. SMF ¶ 108.

### C.     Loan Modification

As of November 20, 2015, SLS deemed Ms. Benner's application complete. SMF ¶ 114. At that time, SLS still had not received an RMA, Dodd Frank, or Hardship Letter from a "financial contributor" other than Ms. Benner. SMF ¶ 180. SLS's corporate representative has testified that SLS "ultimately made an underwriting decision and granted an exception" to its requirement for an RMA from a financial contributor. Ward Depo. Tr. 79:1-14.

By letter dated November 24, 2015, SLS informed Ms. Benner that she qualified for a HAMP Tier 1 Modification. SMF ¶ 117. Ms. Benner rejected the November 24th HAMP offer on the advice of SLS's counsel, who told her that doing

---

[4]     Ms. Benner had previously explained in a March 19, 2015 letter to SPS that she worked "on call" seasonally for L.L. Bean. SMF ¶ 199.

so could allow her to qualify for a proprietary modification that would provide a reduction to her principal balance. SMF ¶¶ 119, 120, 124, 200. On January 11, 2016 SLS offered Ms. Benner the more favorable modification contingent on her making certain trial period payments. SMF ¶ 202. Ms. Benner completed the trial payments and was offered a permanent modification on June 13, 2016, which she accepted. SMF ¶ 203. The final Loan Modification Agreement reduced Ms. Benner's unpaid principal loan balance by over $100,000. SMF ¶ 129. The modification also waived all interest and other fees that had accumulated on the loan since Ms. Benner and Mr. Benner's April 2011 default. SMF ¶ 131. As a result of the modification, the loan became a performing, current loan and Wells Fargo dismissed the foreclosure action as of June 27, 2016. SMF ¶ 140, 204.

## VI.   Ms. Benner's Second Purported Qualified Written Request

On August 4, 2016, Ms. Stark sent SLS a letter in which she claimed that after the permanent modification was implemented in May 2016, some of her payments had been marked as partial and put in suspense. SMF ¶ 148. The letter also requested a complete life-of-loan history from the date of origination forward, and a full accounting and itemization of the amounts capitalized into the $ 185,000 modified unpaid principal balance of the loan modification. Ex. 24 at 15.

SLS received the letter on August 12, 2016 and acknowledged receipt on August 15, 2016. SMF ¶¶ 149-50. On September 9, 2016, SLS provided a more fulsome response, informing Ms. Benner that there was an escrow shortage on the loan and enclosing the latest escrow analysis for her review. SMF ¶ 151. SLS's

response also included copies of Ms. Benner's "payment history and transaction codes." Ex. 24 at 23-31.

## A.     Ms. Benner's Purported Damages

Ms. Benner has testified that she suffered emotionally as a result of SLS's alleged delay in processing her loss mitigation application and as a result of SLS's allegedly needless document requests. SMF ¶ 207; Benner Decl. ¶ 24 (ECF No. 74). Ms. Benner has also testified that the fear of losing her home caused her stress from the time of her default in 2011 until she received the permanent modification. SMF ¶ 158. As reflected in Ms. Benner's medical records, Ms. Benner did not see a doctor or a therapist and was not prescribed any medication in response to the distress she attributes to SLS's conduct. SMF ¶¶ 153-157.

Ms. Benner paid Ms. Stark $6,255.75 for representation during the foreclosure process and incurred additional unpaid fees for that same representation. SMF ¶ 205. Ms. Benner also paid travel costs to go to and from her housing counselor's office to drop off documents SLS had requested, and missed work to attend the June 8, 2015 mediation and to travel to deliver documents. SMF ¶ 206.

## PROCEDURAL BACKGROUND

Ms. Benner initially filed this action against the Defendants in state court on August 24, 2016. Notice of Removal 1 (ECF No. 1). On September 14, 2016, the Defendants removed the action to this Court. Notice of Removal 1. Ms. Benner filed a First Amended Complaint on October 13, 2016 (ECF No. 13), which the Defendants Answered. (ECF No. 14).

On June 19, 2017, I held a Local Rule 56(h) conference with the parties during which I set a summary judgment briefing schedule. Local Rule 56(h) Pre-Filing Conference Report and Order 3 (ECF No. 56). Proceeding in line with that schedule, the Defendants filed a motion for summary judgment on July 14, 2017. Defs.' Mot. for Summary Judgment (ECF No. 66) ("**Defs.' Mot.**"). Four days later, Ms. Benner filed a motion to supplement the First Amended Complaint. Pl.'s MTS. Through her motion, Ms. Benner seeks to add allegations to the First Amended Complaint that purportedly describe "events that have transpired since the date of filing the First Amended Complaint." Pl.'s MTS 1. Specifically, Ms. Benner seeks to allege that on July 5, 2017, SLS's automatic payment system erroneously deducted $402.78 more from her account than was due for her monthly loan payment. Pl.'s MTS 3.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

The Defendants have moved for summary judgment on all remaining counts in the First Amended Complaint. Ms. Benner has moved for summary judgment on all counts on all issues except damages.

## I.    Legal Standard

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine where a reasonable jury could resolve the point

in favor of either party. *Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). A fact is material where it could influence the outcome of the litigation. *Id.*

On a motion for summary judgment, courts must construe the record in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016). Cross-motions for summary judgment proceed under the same standards applicable to standalone summary judgment motions, but each motion is addressed separately. *Fadili v. Deutsche Bank Nat'l Tr. Co.*, 772 F.3d 951, 953 (1st Cir. 2014).

## II.     Real Estate Settlement Procedures Act Claims

### A.     Background: RESPA and Regulation X

Count II of Ms. Benner's First Amended Complaint asserts that the Defendants violated RESPA and its implementing regulations. "RESPA is a consumer protection statute that regulates the real estate settlement process." *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006) (citing 12 U.S.C. § 2601(a)). The Consumer Financial Protection Bureau ("**CFPB**") has promulgated a set of rules under RESPA known as "Regulation X," which lay out servicers' obligations to borrowers. 12 C.F.R. § 1024 *et seq.* Borrowers may enforce the provisions of Regulation X pursuant to RESPA § 6(f), which provides that "[w]hoever fails to comply with any provision of [RESPA] shall be liable to the borrower for each such failure." 12 U.S.C. § 2605(f); *see also* 12 C.F.R. § 1024.41(a).

Ms. Benner claims that the Defendants committed more than a dozen RESPA violations that added up to a pattern or practice of noncompliance.[5] The purported violations fall into two categories: (1) failure to "exercise reasonable diligence in obtaining documents and information to complete [Ms. Benner's] loss mitigation application" in violation of 12 C.F.R. § 1024.41(b)(1); and (2) failure to timely or completely respond to Ms. Benner's purported Qualified Written Requests ("**QWRs**") or Notices of Error in violation of 12 U.S.C. § 2605(e) and 12 C.F.R. §§ 1024.35 and 1024.36. In her summary judgment motion, Ms. Benner claims that she has established these violations as a matter of law.

For their part, the Defendants argue that they are entitled to summary judgment on Ms. Benner's RESPA claims because the record shows that they expediently reviewed Ms. Benner's loss mitigation application and satisfactorily responded to Ms. Benner's purported QWRs. The Defendants also raise two threshold issues, which I address before turning to the parties' arguments on Ms. Benner's individual RESPA claims.

### B.    Whether the Duplicative Request Rule Applies

Regulation X provides that "[a] servicer is only required to comply with the requirements of this section for a single complete loss mitigation application for a borrower's mortgage loan account." 12 C.F.R. § 1024.41(i) (2014).[6] The Defendants

---

[5]    In addition to allowing for actual damages, § 2605 of RESPA allows courts to assign damages of up to $ 2,000.00 against a defendant that has engaged in a pattern or practice of noncompliance with that section. 12 U.S.C. § 2605(f).

[6]    Section 1024.41(i) was amended in October of 2016, effective October 19, 2017, as part of a broader series of amendments to Regulation X. I rely herein on the versions of the regulations in effect during the events at issue. I note that many of the amendments to Regulation X were aimed directly

argue that under this rule, once *any* servicer has received and evaluated a complete loss mitigation application for a loan, *no* servicer need follow RESPA's loss mitigation requirements as to that loan going forward. Defs.' Mot. 3. The Defendants note that SPS received and evaluated two loss mitigation applications from Ms. Benner before SLS took over servicing. Def.'s Mot. 3. Therefore, they argue, SLS was not bound to follow RESPA's requirements when handling Ms. Benner's subsequent loss mitigation applications. Def.'s Mot. 4.

The Defendants' interpretation of § 1024.41(i) is at odds with the provision's plain language, which refers only to "*a* servicer," and with the CFPB's interpretations of that rule. When the CFPB adopted § 1024.41(i), it explained:

> In the propos[ed rule], the Bureau stated that where servicing was transferred after the borrower received an evaluation on a complete loss mitigation application from the transferor servicer, the transferee servicer still may be required to comply with the requirements of proposed § 1024.41. The Bureau believes that when an investor or guarantor is transferring servicing to a new servicer, which may have been driven by an investor's or guarantor's determination that the new servicer can better achieve loss mitigation options with borrowers, borrowers should be able to renew an application for a loss mitigation option with the transferee servicer, subject to the applicable deadlines and requirements in proposed § 1024.41.

Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696-01, 10836 (Feb. 14, 2013). The agency "finaliz[ed] the rule as proposed," *id.*, and adopted a set of official comments to clarify that:

> A transferee servicer is required to comply with the requirements of § 1024.41 regardless of whether a borrower received an evaluation of a complete loss mitigation application from a transferor servicer.

---

at clarifying transferee servicers' obligations after a servicing transfer. *See* 12 C.F.R. § 1041.41(k) (2017). The reader should consider this decision within its appropriate regulatory context.

> Documents and information transferred from a transferor servicer to a transferee servicer may constitute a loss mitigation application to the transferee servicer and may cause a transferee servicer to be required to comply with the requirements of § 1024.41 with respect to a borrower's mortgage loan account.

*Id.* at 10898 (codified as 12 C.F.R. Pt. 1024, Supp. I, cmt. 41(i)(1) (2014)).[7] That is, the CFPB contemplated that transferee servicers would comply with § 1024.41 when evaluating a borrower's loss mitigation application regardless of whether the borrower already had received an evaluation of a complete loss mitigation application and regardless of whether the transferor servicer had been processing a loss mitigation application for that borrower.[8]

The CFPB has not deviated from this approach. When it amended the language of § 1024.41(i) in October of 2016, the CFPB again emphasized that transferee servicers must comply with § 1024.41's requirements:

> Section 1024.41(i) provides that a servicer need not comply with § 1024.41 for a subsequent loss mitigation application from a borrower where certain conditions are met. *A transferee servicer and a transferor servicer, however, are not the same servicer*. Accordingly, a transferee servicer is required to comply with the applicable requirements of § 1024.41 upon receipt of a loss mitigation application from a borrower whose servicing the transferee servicer has obtained through a servicing

---

[7]     These comments are "the primary vehicle by which the Bureau of Consumer Financial Protection issues official interpretations of Regulation X." 12 C.F.R. § 1024, Supp. I, Intro., cmt. 1. I consider the CFPB's commentary as highly persuasive authority when evaluating 12 C.F.R. § 1024. *See Nash v. PNC Bank, N.A.*, No. CV TDC-16-2910, 2017 WL 1424317, at *4 (D. Md. Apr. 20, 2017) (finding the CFPB's commentary "highly persuasive" when interpreting gaps in 12 C.F.R. § 1024, and collecting cases that have relied on the CFPB's commentary); *cf. Auer v. Robbins*, 519 U.S. 452, 461 (1997) (an agency's interpretation of its own ambiguous regulation is entitled to deference unless "plainly erroneous or inconsistent with the regulation").

[8]     As Ms. Benner notes, even if § 1024.41(i) could be interpreted to release transferee servicers from § 1041's requirements, the Defendants still would not be entitled to summary judgment. Section 1024.41(i) requires a servicer to *comply* with § 1024.41 only once for a complete loss mitigation application. Here, Ms. Benner contends that SPS never fully complied with § 1024.41, including because it failed to inform her in writing that it had rejected her previous loss mitigation applications.

transfer, even if the borrower previously received an evaluation of a complete loss mitigation application from the transferor servicer.

12 C.F.R. Pt. 1024, Supp. I, cmt. 41(i)(2) (2017) (emphasis added).[9]

SPS's review of Ms. Benner's loss mitigation application is therefore of no consequence to SLS's obligations: Once servicing transferred to SLS, SLS was required to comply with the provisions of § 1024.41 anew. The Defendants are not entitled to summary judgment on Ms. Benner's RESPA claims on the basis of § 1024.41(i).

## C. Whether Ms. Benner has Presented Evidence of Cognizable Damages

"Damages are 'an essential element' of a RESPA claim." *Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1011 (11th Cir. 2016). RESPA permits plaintiffs to recover "any actual damages to the borrower" or "in the case of a pattern or practice of noncompliance [with RESPA]," statutory damages. 12 U.S.C. § 2605(f)(1). In the case of actual damages, the plaintiff's harm must have accrued "as a result of the [defendant's] failure" to comply with the Act. *See* 12 U.S.C. § 2605(f). Because any damages that would have accrued regardless of a violation cannot have occurred "as a result of" that violation, RESPA plaintiffs "must present specific evidence to establish a causal link between the financing institution's violation and their injuries." *Moore v. Mortg. Elec. Registration Sys., Inc.*, No. 10-cv-241-JL, 2013 WL

---

[9]     The Defendants rely on *Mangum v. First Reliance Bank* to assert that the CFPB has in fact interpreted this regulation in the opposite manner. No. 4:16-CV-02214-RBH, 2017 WL 1062534, at *3 (D.S.C. Mar. 21, 2017). At oral argument, counsel for the Defendants was at a loss to explain the *Mangum* court's reasoning in light of the regulation's plain language and the CFPB's clear guidance.

1773647, at *3 (D.N.H. Apr. 25, 2013) (quoting *McLean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010)).

The Defendants argue that Ms. Benner's RESPA claim must be dismissed because she has failed to present evidence that the Defendants' purported RESPA violations caused her actual damages. Ms. Benner responds that she has suffered actual damages from the Defendants' conduct in the form of emotional distress, attorneys' fees, and costs and expenses.[10]

### D.    Emotional Distress Damages

The Defendants dispute whether Ms. Benner can claim emotional distress damages under RESPA. The First Circuit has not yet addressed whether RESPA allows for emotional distress damages. However, in light of the First Circuit's directive to construe consumer protection statutes like RESPA "liberally in favor of consumers," *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 171 (1st Cir. 2004), a growing number of courts in this Circuit have concluded that the phrase "any actual damages" should be read to include damages for emotional distress. *McGahey v. Fed. Nat'l Mortg. Ass'n*, 266 F. Supp. 3d 421, 441 (D. Me. 2017); *see also Afridi v. Residential Credit Sols., Inc.*, 189 F. Supp. 3d 193, 200 (D. Mass. 2016); *Moore*, 848 F. Supp. 2d at 123. I concur with the reasoning of these decisions, and I find that emotional distress damages are recoverable under RESPA.

---

[10]    Ms. Benner also claims as damages interest and fees that accrued on her loan from the date of her default until the time of her successful modification. The Defendants argue that these fees and interest cannot be considered as damages because the Defendants waived and did not capitalize the interest that accrued on Ms. Benner's account when they modified her loan. Defs.' Mot. 13. Ms. Benner does not respond to this argument and therefore concedes the point.

The Defendants argue that even if RESPA allows for emotional distress damages, Ms. Benner has failed to connect her purported distress to the Defendants' RESPA violations. Defs.' Mot. 13-14. The Defendants point out that Ms. Benner has testified that she suffered stress in connection with the foreclosure proceedings from the time she first defaulted in 2011. They argue that Ms. Benner cannot disentangle that stress from any stress she endured during SLS's evaluation of her loss mitigation application. Defs'. Mot. 14.

The Defendants attempt to brush aside the fact that Ms. Benner has submitted a declaration that describes concrete symptoms of her distress and expressly connects them to SLS's repeated document requests:

> When I knew that SLS kept wanting more documents, some I had already sent in, and wasn't giving me answer about the mod, I had a hard time concentrating and sleeping because I kept worrying about what SLS would do. I had vivid nightmares. I ate more and gained weight. I knew the foreclosure was still active and I didn't want to lose my house to foreclosure. I cried easily and was more uptight with my family. I was on edge always wondering if I could keep my home and if not, what I would possibly do with a disabled son and dying grandmother.

Benner Decl. ¶ 24.

The Defendants ask me to disregard Ms. Benner's declaration as a self-serving sham affidavit. "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). The Defendants claim that during her deposition, Ms. Benner testified that she was not aware of the letters that her attorneys were receiving regarding her

loss mitigation application. The Defendants assert that this deposition testimony contradicts her later statement that SLS's document requests caused her emotional distress.

The rule against sham affidavits does not apply here because Ms. Benner's declaration is consistent with her previous testimony. Ms. Benner did not testify that she was unaware that "SLS kept requesting more documents," she testified that Mr. Thomas requested additional documents from her. Benner Depo. Tr. 73:2-9. Ms. Benner also testified that she had to make repeated trips to visit Mr. Thomas to drop off documents, SMF ¶ 206, and it is undisputed that Mr. Thomas emailed Ms. Benner to ask for documents that SLS had requested. *See* SMF ¶ 93. It would be unreasonable to assume that Ms. Benner received Mr. Thomas's emails or provided him with additional documents without understanding that they had been requested for use in her loss mitigation application. I accordingly consider Ms. Benner's declaration as evidence that she suffered emotional distress because of the Defendants' purported RESPA violations.[11]

---

[11] At oral argument, the Defendants relied on *Moore v. Mortgage Electronic Registration Systems, Inc.*, No. 10-CV-241-JL, 2013 WL 1773647, at *3 (D.N.H. Apr. 25, 2013), for the proposition that Ms. Benner has failed to surmount a "high burden" to establish emotional distress damages. *Moore* does not support the Defendants' position. There, the two plaintiffs testified, respectively, to having developed a gluten allergy due to stress and to having begun to take medication due to stress. The court found that this testimony did not suffice to establish emotional distress damages because both of those events took place well before the defendant began servicing their loan, and because "neither plaintiff testified that these conditions were enhanced or exacerbated by [the servicer's] conduct." *Id.* at *3. Here, Ms. Benner has testified to symptoms that occurred while SLS was acting as her loan servicer and that were caused or exacerbated by SLS's purported misconduct.

### E.     Attorneys' Fees

"[A]ttorney's fees are recoverable as actual damages under RESPA if they are not incurred in connection with bringing a suit under the statute." *McGahey*, 266 F. Supp. 3d at 441.[12] Thus, while Ms. Benner cannot claim as damages her attorney's fees for the case at bar, she may claim any fees that she incurred during the foreclosure action solely as a result of the Defendants' purported misconduct. *See id.* at 441-42 (plaintiff could claim as damages attorneys' fees spent to draft a QWR, where the QWR would not have been drafted but for defendants' failure to respond to earlier RESPA communications).

Here, Ms. Benner has presented as evidence her attorney's billing records. Those records reflect that some of the fees that Ms. Benner paid to her attorney went to time spent responding to SLS's document requests. To the extent that Ms. Benner can ultimately show that those requests would have been unnecessary but for SLS's RESPA violations, Ms. Benner may claim those fees as damages.

### F.     Costs and Expenses

Ms. Benner also claims to have incurred out-of-pocket expenses as a result of the Defendants' RESPA violations, including postage and the cost of travel to deliver SLS's requested documents to Mr. Thomas. While the Defendants argue that these costs could have been avoided, they do not dispute that the costs were incurred, and

---

[12]     *Kassner v. Chase Home Finance, LLC*, on which the Defendants rely, is not contradictory. *See* No. CIV.A. 11-10643-RWZ, 2012 WL 260392, at *7 (D. Mass. Jan. 27, 2012). In that case, the plaintiff had sought as damages attorneys' fees incurred in bringing suit under RESPA—not fees associated with a separate foreclosure suit. *Id.* at *7.

I find that whether Ms. Benner should have mitigated these damages is a question of fact.

Thus, the record contains sufficient evidence to allow a reasonable jury to find that the Defendants' purported RESPA violations caused actual damage to Ms. Benner in the form of emotional distress damages, attorneys' fees, and costs and expenses. I therefore deny the Defendants' motion for summary judgment on this ground.[13]

## G. Whether SLS Exercised Reasonable Diligence Under 12 C.F.R. § 1024.41(b)(1)

Regulation X requires servicers to promptly review any loss mitigation application that they receive more than 45 days before a foreclosure sale and to notify the borrower whether the application is complete. 12 C.F.R. § 1024.41(b)(1)-(2). If the application is incomplete, the servicer must "exercise reasonable diligence in obtaining documents and information to complete" that application. 12 C.F.R. § 1024.41(b)(1). Section 1024.41 does not define "reasonable diligence." However, courts interpreting the regulation have found that a servicer may fail to exercise reasonable diligence if it repeatedly requests documents it already possesses or

---

[13] The Defendants also attempt to argue that Ms. Benner's claims are barred because a remedy for her alleged damages was available as part of the foreclosure action, and they have "since been foreclosed by her acceptance of the modification and dismissal of the suit." Defs.' Mot. 19. The Defendants' sole authority for this position is *Cunningham v. Nationstar Mortgage, LLC*, which found that a plaintiff was barred from bringing a RESPA claim because a state court judge had already rendered a final judgment of foreclosure in an action on the plaintiff's mortgage. No. 15-14274-CIV, 2015 WL 12556162, at *2 (S.D. Fla. Oct. 20, 2015) *report and recommendation adopted*, No. 2:15-CV-14274, 2015 WL 12533152 (S.D. Fla. Nov. 9, 2015). The court noted that the plaintiff's RESPA claims "essentially restate[d]" demands he had made before the state court, and that allowing him to proceed on his RESPA claims would "call[] the State Court's Final Judgment into question, even if indirectly so." *Id.* Here, the foreclosure suit was voluntarily dismissed, and the preclusion and *Rooker-Feldman* issues that concerned the *Cunningham* court do not exist.

documents that it knows or should know are not required to complete the borrower's application. *Dionne v. Fed. Nat'l Mortg. Ass'n*, No. 15-CV-56-LM, 2016 WL 6892465, at *6 (D.N.H. Nov. 21, 2016); *see also Jackson v. Bank of Am., N.A.*, No. 16-CV-787-FPG, 2017 WL 5598856, at *4 (W.D.N.Y. Nov. 21, 2017) (plaintiff stated a claim for a violation of 12 C.F.R. Pt. 1024.41(b)(1) in part because "Defendant repeatedly asked Plaintiffs for documents, such as tax returns and social security letters, that they had already submitted").[14]

The CFPB has also suggested examples of reasonable diligence, including the following:

> Servicing for a mortgage loan is transferred to a servicer and the borrower makes an incomplete loss mitigation application to the transferee servicer after the transfer; the transferee servicer reviews documents provided by the transferor servicer to determine if information required to make the loss mitigation application complete is contained within documents transferred by the transferor servicer to the servicer.

12 C.F.R. § 1024, Supp. I, cmt. 41(b)(1) ¶ 4.ii. The CFPB has further suggested that reasonable diligence requires servicers to "promptly request the additional information or a corrected version of a previously submitted document" if the servicer determines during its review of a loss mitigation application that such information is necessary. *Id.* cmt. 41(b)(2)(i)(B) ¶ 1; *see also Jackson*, 2017 WL 5598856, at *5 ("[I]t

---

[14] This does not mean that borrowers are free to second-guess a servicer's documentation requirements. Regulation X allows servicers to request "the documents and information necessary to make [a] loss mitigation application complete." 12 C.F.R. § 1024.41(b)(2)(ii). The CFPB has confirmed that so long as the servicer uses reasonable diligence to acquire those documents, Regulation X gives a servicer "flexibility to establish its own application requirements and to decide the type and amount of information it will require from borrowers applying for loss mitigation options." 12 C.F.R. Pt. 1024, Supp. I, cmt. 41(b)(1) ¶ 1.

was not necessarily reasonable for Defendant to wait nearly four months before notifying Plaintiffs that they needed to submit a new hardship affidavit . . . [,] particularly when [the affidavit's] insufficiency was readily apparent from Plaintiffs' [initial] application.").

Ms. Benner suggests that the Defendants, either deliberately or through incompetence, gave her the runaround for six months. She chronicles numerous purportedly unreasonable actions that SLS took while evaluating her loss mitigation application, each of which she claims was a RESPA violation. In turn, the Defendants emphasize that RESPA gives servicers flexibility to set their own review procedures and argue that SLS's process was reasonable. While the parties each assert that undisputed facts run in their favor, I find that substantial material questions of fact remain in dispute that must be resolved at trial.

For example, the parties dispute whether SLS exercised reasonable diligence to obtain documents necessary to complete the loss mitigation application that Ms. Benner had submitted to SPS. According to Ms. Benner, SLS failed in this obligation when it sought a new loss mitigation application from her on June 20, 2015, instead of obtaining her pending application directly from SPS. In response, the Defendants argue that they were never informed of Ms. Benner's pending application and that in any event SLS acted with reasonable diligence. Upon review of the record, I find that disputes of fact exist as to (i) whether SLS knew or should have known that Ms. Benner had submitted an application to SPS, (ii) when SLS became aware or should have become aware of such notice, and (iii) whether, regardless of any notice provided,

the steps that SLS took to obtain and to review loss mitigation documents from SPS can be considered reasonably diligent.

I likewise cannot determine as a matter of law whether SLS exercised reasonable diligence to obtain documents necessary to its review of Ms. Benner's August 20, 2015, loss mitigation application. Ms. Benner has presented evidence that SLS made missteps in its handling of her application, including making duplicative and potentially confusing requests for documents and, in at least one instance, requesting documents from Mr. Benner when SLS itself had already determined that those documents were not necessary to Ms. Benner's application. However, the Defendants have also provided evidence-backed explanations for many of the actions that Ms. Benner claims were unreasonable. More significantly, as the Defendants pressed at oral argument, Ms. Benner has not established—as a matter of law—that the Defendants' unexplained lapses were more than minor errors or inconveniences that resulted from an otherwise reasonable approach to processing Ms. Benner's application.

While a reasonable jury could ultimately find that SLS's conduct did not satisfy § 1024(b)(1), they could also determine that, on the whole, SLS acted with reasonable diligence. I therefore deny both parties' motions for summary judgment on Ms. Benner's RESPA claim.[15]

---

[15]    Because I find that Ms. Benner's RESPA claim survives summary judgment on the theory that SLS violated § 1024.41(b)(1), I do not separately address her argument that SLS failed to adequately respond to her purported Qualified Written Requests.

### III. Unfair Trade Practices Act and Maine Consumer Credit Code Claims

Ms. Benner also asserts claims under Maine's UTPA and § 9-311-A of the MCCC. The UTPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S. § 207.[16] The MCCC requires creditors to comply with RESPA and Regulation X. 9-A M.R.S. § 9-311-A. "Any violation of [the MCCC] constitutes a violation of the [UTPA]." 9-A M.R.S. § 9-408.

My analysis of Ms. Benner's RESPA claim necessarily applies to her claims under the MCCC and, accordingly, the UTPA. *See* 9-A M.R.S. §§ 9-311-A, 9-408. I therefore deny Ms. Benner's motion for summary judgment on her MCCC and UTPA claims for the reasons stated above. Likewise, I deny the Defendants' motion for summary judgment on the issue of liability under the MCCC and the UTPA for the same reasons outlined in my discussion of Ms. Benner's RESPA claim. Because Maine law provides that any conduct in violation of RESPA is a per se violation of the UTPA, I will not separately analyze whether that same conduct was also unfair or deceptive for UTPA purposes.[17]

---

[16]    An *unfair* act or practice "(1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition." *State v. Weinschenk*, 868 A.2d 200, 206 (Me. 2005). A *deceptive* act or practice "is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances." *Id.* In this context, material means "likely to affect [consumers'] choice of, or conduct regarding, a product." *Id.* An act or practice can be deceptive under the UTPA "regardless of a defendant's good faith or lack of intent to deceive." *Id.*

[17]    Ms. Benner argues that SLS engaged in unfair or deceptive conduct above and beyond the misconduct on which she rests her RESPA claims. Specifically, Ms. Benner avers that SLS violated the UTPA by seeking an RMA for all financial contributors where none was required under the HAMP guidelines and by failing to comply with 12 C.F.R. § 1024.38, which addresses whether a servicer has adopted appropriate policies and procedures to ensure that they obtain documents from a transferor

As with Ms. Benner's RESPA claim, the Defendants separately argue that Ms. Benner's UTPA claim must fail because she has not established damages. Damages under the UTPA are limited to "a loss of money or property that results from the violation." *William Mushero, Inc. v. Hull*, 667 A.2d 853, 855 (Me. 1995) (citing 5 M.R.S. § 213). Emotional damages are therefore not recoverable under the UTPA. *See Bartner v. Carter*, 405 A.2d 194, 202-03 (Me. 1979).[18] Here, Ms. Benner has presented evidence that she suffered pecuniary damages including travel costs and mailing expenses, as well as attorneys' fees expended to respond to SLS's purportedly unnecessary document requests.[19] Summary judgment is therefore not warranted on this ground.

servicer. The parties dispute whether these acts or practices were unfair or deceptive, or were simply reasonable business practices. Ms. Benner may raise these alternative theories at trial.

[18]  Ms. Benner contends that the *Bartner* decision was based on a previous version of 5 M.R.S. § 213, which only allowed damages for "restitution and for such other equitable relief . . . as the court may deem to be necessary and proper." *See Bartner v. Carter*, 405 A.2d 194, 199 (Me. 1979). Ms. Benner is correct that 5 M.R.S. § 213 has been amended to allow plaintiffs to seek "actual damages" in addition to "restitution." *See* P.L. 1991, ch. 536, § 1. However, I find that this amendment likely would not cause the Law Court to decide that emotional distress damages are permissible under the UTPA. In *Bartner*, the Law Court focused not only on the term "restitution," but on the fact that "the 'loss' for which an action for restitution is permitted by section 213 is a loss 'of money or property.' " *Bartner*, 405 A.2d at 202. The court found that "without the benefit of a strained interpretation, that language appears to rule out recovery, under the statute, of several kinds of non-restitutionary damages, such as damages for personal injury, mental distress or loss of time." *Id.* The language to which the Law Court pointed was not altered when § 213 was amended. In light of this "clear statement" of Maine law that emotional distress damages are foreclosed under § 213, I find that Ms. Benner cannot recover emotional distress damages for her UTPA claim. *See Poulin v. Thomas Agency*, 746 F. Supp. 2d 200, 206 (D. Me. 2010).

[19]  The Defendants note that in *Poulin v. Thomas Agency*, the court found that attorneys' fees spent to prevent unfair conduct are not recoverable as damages under the UTPA. Defs.' Mot. 16 (citing 746 F. Supp. 2d 200). I find that *McGahey*, which allowed the plaintiff to claim attorneys' fees as damages under the UTPA where those fees were incurred in connection with an unrelated foreclosure suit, provides the better rule. *See* 266 F. Supp. 3d at 436 ("McGahey asserts that as a consequence of the alleged UTPA violations, he suffered damages in the form of: . . . (2) paying Defendants' attorney's fees in connection with the 2012 foreclosure action; [and] . . . paying his attorney to prevent the 2012 foreclosure. . . . These alleged damages all constitute losses of money or property.").

## IV.   Whether Wells Fargo May Be Found Vicariously Liable for SLS's Misconduct

### A.   Vicarious Liability under RESPA

The Defendants argue that Wells Fargo cannot be found vicariously liable for SLS's RESPA violations because RESPA and Regulation X only impose obligations on mortgage *servicers* and the parties agree that Wells Fargo never serviced Ms. Benner's loan. "The First Circuit has not addressed the issue of vicarious liability under RESPA, and there is a split among other courts." *Bowen v. Ditech Fin. LLC*, No. 2:16-CV-00195-JAW, 2017 WL 4183081, at *30 (D. Me. Sept. 20, 2017).

A majority of courts have found that liability under RESPA and Regulation X is limited to servicers and not to those servicers' principals. *Bowen*, 2017 WL 4183081, at *30; *Hawk v. Carrington Mortg. Servs., LLC*, No. 3:14-CV-1044, 2016 WL 4433665, at *2 (M.D. Pa. Aug. 17, 2016); *Bennett v. Nationstar Mortg., LLC*, No. CV 15-00165-KD-C, 2015 WL 5294321, at *10-11 (S.D. Ala. Aug. 17, 2015) *report and recommendation adopted* 2015 WL 5294321 (Sept. 8, 2015); *McAndrew v. Deutsche Bank Nat. Tr. Co.*, 977 F. Supp. 2d 440, 445 (M.D. Pa. 2013); *Gibson v. Mortg. Elec. Registration Sys., Inc.*, No. 11-2173-STA, 2011 WL 3608538, at *5 (W.D. Tenn. Aug. 16, 2011). Those courts have reasoned that § 2605 of RESPA and its associated regulations speak exclusively about the obligations of "servicers," and that "Congress presumably meant what it said" when it elected to speak only to servicers' responsibilities. *Bowen*, 2017 WL 4183081, at *31 (quoting *Hawk*, 2016 WL 4433665, at *4); *see also Gibson*, 2011 WL 3608538, at *5 (no vicarious liability because "RESPA makes clear that only loan 'servicers' have a duty to timely respond to QWRs"); *Hawk*,

2016 WL 4433665, at *2 ("There is nothing in the language of RESPA that may be read to extend statutory liability to the passive mortgage holder, however salutary such a provision might be had it been included in the Act."); *Bennett*, 2015 WL 5294321, at *10 ("[T]he provisions of RESPA and Regulation X specify exactly which type of actor is burdened by those provisions."). RESPA defines "servicer" as "the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)." 12 U.S.C. § 2605(i)(2). Additionally, as the court in *Bowen* recently observed, "[a]lthough 12 U.S.C. § 2605(f) uses the language 'whoever' violates the section is liable, the obligations laid out in that section only apply to servicers." 2017 WL 4183081 at *31.

Two courts have reached the opposite conclusion. *Rouleau v. US Bank, N.A.*, No. 14-CV-568-JL, 2015 WL 1757104 (D.N.H. Apr. 17, 2015); *Cruz v. Green Tree Mortg. Servicing*, LLC, 2016 U.S. Dist. LEXIS 107391 (D. Conn. Aug. 15, 2016). In *Rouleau*, the District Court for the District of New Hampshire found that a mortgagee could be held vicariously liable under RESPA for the acts of its servicer. *Rouleau*, 2015 WL 1757104, at * 8. The court first noted the general rules that (1) statutes such as RESPA that provide a remedy for a breach of a defined duty create "a species of tort liability"; (2) " 'when Congress creates a tort action, it legislates against [a] legal background of ordinary tort-related vicarious liability rules,' " and "its statutorily created torts 'incorporate those rules' "; and (3) "unless Congress has 'expressed a contrary intent' . . . this court must infer that 'ordinary rules [] apply.' " *Id.* at *7 (quoting *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999);

*Meyer v. Holley*, 537 U.S. 280, 285 (2003)). The court observed that the defendant had offered no statutory language or precedent to suggest that Congress intended to except RESPA from the ordinary rules of vicarious liability. *Id.* The court specifically addressed RESPA's definition of "servicer," noting that:

> All this language accomplishes is to make clear that a mortgagee or noteholder that services its own loan is bound by the same statutory and regulatory requirements that apply to servicers acting on behalf of other entities. It does not shed any light on whether a mortgagee or noteholder that does not service its own loan can be held liable where the servicer acting on its behalf fails to abide by those requirements.

*Id.*

I agree with the court in *Rouleau* that RESPA and its regulations create a species of tort and that therefore, absent some indication of contrary intent from Congress, the ordinary rules of vicarious liability should apply. 2015 WL 1757104, at *8. "In order to abrogate a common-law principle, [a] statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993). While Congress need not " 'affirmatively proscribe' the common-law doctrine at issue, . . . 'courts may take it as a given that Congress has legislated with an expectation that the [common law] principal will apply except 'when a statutory purpose to the contrary is evident.' " *Id.*; *see also Meyer v. Holley*, 537 U.S. 280, 287 (2003) (Court would not apply a rule of vicarious liability that reached beyond traditional common-law principals, where it could find no expression of Congressional intent to displace the ordinary rule); *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (holding that the doctrine of corporate veil-piercing applied under the Comprehensive Environmental Response, Compensation, and Liability Act because "the failure of the

statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of" common-law principles).

I further agree with *Rouleau* that RESPA's definition of and references to the conduct of "servicers" do not suffice to show a Congressional intent to abrogate the ordinary rules of vicarious liability. RESPA may limit direct liability to certain parties, but it does not discuss the liability implications of those servicers' relationships. Congress is well capable of expressing an intent to limit vicarious or other indirect forms of liability. As discussed by the court in *Cruz*, which adopted the reasoning of *Rouleau*, the Truth in Lending Act limits the indirect liability of creditors' assignees by providing that assignees "can be held liable *only if* certain conditions are met." 2016 U.S. Dist. LEXIS 107391 at *25, 38.[20] RESPA includes no such reference to derivative liability. This gap should be filled by reference to ordinary common-law rules. For the foregoing reasons, I find that Wells Fargo may be vicariously liable for SLS's purported RESPA violations.

## B.    Vicarious Liability under the UTPA

The Defendants also argue that Wells Fargo cannot be held vicariously liable for SLS's UTPA violations because the "UTPA does not allow for vicarious liability."

---

[20]    The *Bowen* and *Hawk* decisions offer an inverse version of this argument, noting that "when Congress chose in RESPA to extend liability beyond loan servicers to others, it did so clearly and explicitly." *Bowen v. Ditech Fin. LLC*, No. 2:16-CV-00195-JAW, 2017 WL 4183081, at *31 (D. Me. Sept. 20, 2017); *Hawk v. Carrington Mortg. Servs., LLC*, No. 3:14-CV-1044, 2016 WL 4433665, at *2 (M.D. Pa. Aug. 17, 2016). This argument refers to RESPA's anti-kickback provisions, which state that "no person" shall give or accept kickbacks. 12 U.S.C. § 2607. I am not persuaded. It is unsurprising that Congress elected to use "global" language to define the scope of *direct* liability in the case of kickbacks, which are two-sided transactions involving misconduct by both the provider and the recipient. As discussed above, I do not doubt that Congress intended to limit *direct* liability under § 2605 to servicers, but I find no indication that Congress similarly intended to limit *indirect* liability for servicers' violations of that provision.

Defs.' Mot. 18. The Law Court has found precisely the opposite. *See Advanced Const. Corp. v. Pilecki*, 901 A.2d 189, 196 (Me. 2006) ("In an action for the tortious conduct of an agent, both the agent and the principal can be held liable. Actions pursuant to the UTPA and actions for unlawful and deceptive conduct sound in tort.").[21] Following this authority, I find that vicarious liability is available under the UTPA and that Ms. Benner can seek to hold Wells Fargo liable as SLS's principal for SLS's purported UTPA violations. I therefore deny the Defendants' motion for summary judgment as to Wells Fargo's vicarious liability.[22]

## MOTION TO SUPPLEMENT

### I.    Legal Standard

Rule 15(d) of the Federal Rules of Civil Procedure provides that:

Upon motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction,

---

[21]    The only authority the Defendants cite in support of their argument is *James v. GMAC Mortgage LLC*, which found that a mortgagee was not responsible for the actions of a servicer because "[l]iability under the Maine UTPA attaches only to the party that performed the unfair or deceptive act." 772 F. Supp. 2d 307, 321 (D. Me. 2011). However, the *James* decision offered no support for this proposition other than a citation to 5 M.R.S.A. § 213(1), which does not limit the parties against which an UTPA plaintiff can proceed.

[22]    Ms. Benner also brings her UTPA claim against Wells Fargo directly. Citing to a Consent Judgment issued in *United States v. Bank of America Corp.*, No. 12-0361 (D.D.C Apr. 4, 2012), Ms. Benner asserts that Wells Fargo is obligated to ensure that its servicers "notify potentially eligible borrowers of currently available loss mitigation options and, upon receipt of a complete application, evaluate borrowers for all available loss mitigation options and offer and facilitate such modifications." Pl.'s Opp'n 22. Ms. Benner argues that here, Wells Fargo failed to fulfill this obligation.

The Consent Judgment has no effect on this action. By its express terms, the Consent Judgment applies only to Wells Fargo's "division(s) or major business unit(s) that are engaged in customer-facing servicing of residential mortgages on owner-occupied properties." Consent Judgment ¶ IX(B)(2) (ECF No. 73-8). Ms. Benner does not dispute that Wells Fargo both owns Ms. Benner's loan and has been sued in its capacity as Trustee for the MASTR 2007-NCW Trust, not as a servicer. I therefore grant the Defendants' motion for summary judgment as to Wells Fargo's direct liability under the UTPA.

occurrence, or event that happened after the date of the pleading sought
to be supplemented.

Fed. R. Civ. P. 15(d). By allowing litigants to plead events that occurred after the date of the subject pleading, this rule "promot[es] as complete an adjudication of the dispute between the parties as is possible." *U.S. ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 4 (1st Cir. 2015). Rule 15(d) also "helps courts and litigants to avoid pointless formality: although causes of action accruing after the institution of a lawsuit usually can be filed as separate actions, supplementation under Rule 15(d) is often a more efficient mechanism for litigating such claims." *Id.* Leave to supplement is therefore encouraged "when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action." *Id.*

There are, of course, limits to this liberal approach. Motions to supplement "cannot be used to introduce a separate, distinct and new cause of action." *Lath v. Manchester Police Dep't*, No. 16-CV-534-LM, 2017 WL 1740197, at *2-3 (D.N.H. May 4, 2017); *see also Sheppard v. River Valley Fitness One, L.P.*, No. CIV.00-111-M, 2002 WL 197976, at *5 (D.N.H. Jan. 24, 2002) ("[A]fter-occurring events must 'bear some relationship to the subject of the original pleading.' " (quoting 3 MOORE'S FEDERAL PRACTICE § 15.30 at 15-108)). Moreover, courts disfavor motions "whose timing prejudices the opposing party by requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004).

## II. Discussion

Ms. Benner's proposed "Supplemental First Amended Complaint" seeks to add not only factual allegations, but also a new legal theory under her UTPA claim and new claims under the federal Fair Debt Collection Practices Act and the Maine Fair Debt Collections Practices Act. Proposed Supp. Compl. ¶¶ 233, 236-40 (ECF No. 70-1). In their response to Ms. Benner's motion, the Defendants principally argue that her newly-proposed allegations and claims bear no nexus to the First Amended Complaint. Defs.' Opp'n to MTS 3-6 (ECF No. 71). The Defendants emphasize that whereas the First Amended Complaint addressed the Defendants' handling of Ms. Benner's loss mitigation applications, the proposed supplemental allegations deal exclusively with SLS's conduct in collecting Ms. Benner's loan payments. Defs.' Opp'n to MTS 5.

I agree. The sole links between Ms. Benner's First Amended Complaint and the facts and claims added to her proposed Supplemental First Amended Complaint are (1) the identity of the parties and (2) the subject loan. Ms. Benner attempts to argue that the proposed supplemental facts support her existing claims by showing ongoing misconduct and mismanagement of her loan. MTS 2. They do not. Ms. Benner has drawn no connection between SLS's debt collection practices and its loss mitigation practices other than that she takes issue with both.[23] This is not sufficient

---

[23] Ms. Benner's one-off allegation in her First Amended Complaint that SLS overcharged her immediately following her loan modification does not impact this analysis. Pl.'s Reply in Support of MTS 1-2 (ECF No. 72). Ms. Benner did not, as she suggests, claim that the initial overcharge constituted a misrepresentation by SLS. Instead, her allegation as to that overcharge is included in her description of the letter that she sent to SLS on June 4, 2016 and to which SLS purportedly failed to respond.

to link her original claims with her proposed supplemental ones. *See Lath*, 2017 WL 1740197, at *3 (denying motion to supplement because new claims asserted distinct legal obligations from those addressed in the original complaint); *Polansky v. Wrenn*, No. 12-CV-105-PB, 2013 WL 1165158, at *3 (D.N.H. Feb. 22, 2013), *report and recommendation adopted sub nom. Polansky v. N.H. Dep't of Corr.*, No. 12-CV-105-PB, 2013 WL 1155429 (D.N.H. Mar. 19, 2013) (plaintiff's new claims for improper treatment of an infection by prison medical staff were not sufficiently related to earlier claims regarding treatment of his chronic medical condition to justify supplementation).

While there might be some slight judicial economy to allowing Ms. Benner to bring these unrelated, newly-asserted claims as part of this action, that benefit would be overwhelmed by the delay caused by re-opening discovery into an entirely new course of conduct unconnected to any of Ms. Benner's original claims. In light of the foregoing, I will deny Ms. Benner's motion to supplement. My denial of Ms. Benner's motion is without prejudice to her bringing the requested claims as a new action. *See Lath*, 2017 WL 1740197, at *4.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendants' motion for summary judgment as to Wells Fargo's direct liability under the UTPA, but otherwise **DENIES** the Defendants' motion for summary judgment. The Court also **DENIES** the Plaintiff's motion for summary judgment and **DENIES** the Plaintiff's motion to supplement.

SO ORDERED.

                                        /s/ Nancy Torresen
                                        United States Chief District Judge

Dated this 29th day of March, 2018.